UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Nathaniel Salley and Joseph Salley, as Personal Representatives of the Estate of Annie Salley, | ) ) ) | C/A No. 2:10-cv-00791-DCN |
| Plaintiffs, | ) ) | |
| Versus | ) ) | **REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE CARLYLE GROUP'S MOTIONS TO DISMISS** |
| Heartland-Charleston of Hanahan, SC, LLC, d/b/a Heartland Healthcare Center – Charleston; HCR Manorcare, Inc.; Manor Care, Inc.; Manor Care of America, Inc.; HCR Manorcare Medical Services of Florida, LLC; The Carlyle Group, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

    Defendant The Carlyle Group has moved to dismiss the claims against it for lack of personal jurisdiction, pursuant to Rule 12(b)(2), Fed. R.Civ. P., because The Carlyle Group does not have any contacts with the State of South Carolina sufficient to establish personal jurisdiction under the South Carolina long-arm statute or the Due Process Clause. In addition, The Carlyle Group moves for dismissal from this action pursuant to Rule 12(b)(6), Fed. R. Civ. P., because the Plaintiffs fail to state a claim upon which relief can be granted against this Defendant based on the mere allegations that The Carlyle Group is a private equity firm which owns the Defendant Heartland facility or its parent company.

    The Plaintiffs have submitted information from the Defendant's website and letters submitted to DHEC along with a memorandum in opposition to the pending motions. The Defendant submits this reply to clarify the facts as shown by the evidence and to address why the case law cited by the Plaintiffs does not support any colorable claim of personal jurisdiction over or potential liability against The Carlyle Group.

1

I.     **CLARIFICATION OF THE APPLICABLE STANDARD ON MOTIONS TO DISMISS**

First, the Plaintiffs do not appear to recognize the appropriate standard for consideration of the allegations of the complaint in connection with this Defendant's motions to dismiss. The Plaintiffs cannot sustain their claims on bold, bare allegations that The Carlyle Group owns and/or controls ManorCare and the facilities owned by entities five (5) layers down the corporate organizational chart.[1]

The Supreme Court has in the last several years, in Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), declared that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " The Plaintiffs' complaint does not meet this standard. In addition, beyond the sufficiency of the allegations, the cases cited by the Plaintiffs do not support any theory of liability against The Carlyle Group.

II.    **CLARIFICATION OF THE FACTS -- THE ATTENUATED RELATIONSHIP BETWEEN THE CARLYLE GROUP AND THE HEARTLAND FACILITY.**

Regardless of the Plaintiffs' rhetoric about the adequacy of the Defendant's affidavits,[2] the undisputed fact is that Carlyle Group does not own the Heartland facility in which Annie Salley was a patient/resident. That facility is owned by the Heartland-Charleston of Hanahan, SC, LLC, which is owned by HCR III Healthcare, LLC (as "direct parent"). In turn, HCR III Healthcare, LLC is owned by HCR II Healthcare, LLC, which is owned by HCR Healthcare,

---

[1] The Plaintiffs complain that the Defendant has not responded to any discovery requests. However, the undersigned affirms to the Court that materials have been exchanged on the issue of The Carlyle Group's ownership of the shares; and the Plaintiffs have not taken any steps (i.e. Rule 11 consultation) to move for an order compelling discovery from this Defendant. Moreover, the other Manor Care Defendants have responded to the Plaintiffs' initial discovery requests and are in the process of supplementing their initial responses.

[2] Notably, the Plaintiffs have not submitted any affidavits. Their exhibits were submitted without any authenticating affidavits.

2

LLC, which is owned by Manor Care, Inc., which is owned by HCR ManorCare, Inc. (See Exhibit A, Corporate Structure Chart).

Prior to 2007, Manor Care, Inc. was a publicly-traded corporation. Manor Care, Inc. went private in 2007, in an acquisition managed by The Carlyle Group, a private equity firm. More specifically, "The Carlyle Group" is a trade name under which Carlyle Investment Management, LLC operates; it is a registered investment advisor that manages and advises investment funds and has its principal place of business in Washington, D.C. [Ferguson Affidavit.]

The Plaintiffs allege that The Carlyle Group purchased Manor Care, Inc. in that transaction, relying upon a website announcement that: "Manor Care, Inc. (NYSE HCR) today [December 21, 2007] announced that global private equity firm The Carlyle Group has completed its $6.3 billion acquisition of Manor Care." [Plaintiffs' Exhibit 3]

As a matter of general proposition, it is questionable whether a website announcement of such nature should be accepted as admissible evidence of ownership. But, certainly in this case, the website announcement cannot be considered sufficiently credible or reliable in light of the other documentation in the Plaintiffs' knowledge and tendered to this court, as well as the public filings with the SEC in connection with that transaction, all of which confirm that The Carlyle Group is not the owner, but rather, a management firm.

First, upon consideration of the exhibits submitted by the Plaintiffs with its memorandum in opposition, there is no credible support for the Plaintiffs' allegation that The Carlyle Group owns Manor Care, Inc. Looking to the website announcement, it represents that: "The Carlyle Group is a global private equity firm with $74.9 billion *under management committed to 57 funds*." [Plaintiffs' Exhibit 3.] The letters discussed below from the law firms to the S.C.

3

Department of Health and Environmental Control (SCDHEC) confirm that The Carlyle group is not the owner nor is it in control of the facility. See Plaintiff's Exhibits 1 and 4.

The Nelson Mullins letter of October 17, 2007, [Plaintiff's Exhibit 1], is a report on behalf of Manor Care, Inc., to SCDHEC explaining the acquisition for the purposes of state licensing requirements. The chart of ownership structure evidences that The Carlyle Group is a private equity fund and that the shares in HCR ManorCare, Inc. are owned by several passive investors managed by The Carlyle Group: Carlyle Partners, V-A MC, LP; Carlyle Partners V MC, LP; Carlyle MC Partners, L.P. [3]

The Parker Poe letter of November 3, 2007, [Plaintiffs' Exhibit 4], is a report on behalf of HCR Manor Care to confirm a potential "change in ownership" (for regulatory purposes) several layers above the South Carolina facilities which was determined did not constitute a change in ownership or control under our state law. And perhaps most significantly, contrary to the Plaintiffs' claims, this letter confirms that the operation of the facilities and the day-to-day patient care were not affected by the transaction.

The Merger Agreement, which is referenced in the Nelson Mullins letter[4], and the SEC Schedule 14A Proxy Statement[5] contain considerably more detail about the acquisition and confirm that The Carlyle Group did not purchase the shares on its own behalf. These documents explain that ManorCare, Inc. merged with an entity (MCHCR-CP Merger Sub, Inc. (MergerCo.) which is an affiliate of The Carlyle Group. Pursuant to the merger, ManorCare, Inc. became

---

[3] The Affidavit of Jeffery Ferguson, submitted with the Defendant's motion, confirms that these three still own shares, and that in addition, shares now are owned also by CP V Coinvestment A, L.P. and CP V Coinvestment B, L.P.

[4] The Plaintiffs did not present the Merger Agreement with the Nelson Mullins letter, although it was referenced as an exhibit thereto.

[5] The SEC Form 14A is a public document, readily accessible on the internet at http://www.sec.gov/archives/edgar/data/878736/000095012307012617/y27078ddefm14a.htm and the Merger Agreement is part of that document.

wholly owned by MCHCR-CP Holdings Inc., the sole stockholder of MergerCo. Since the merger, the stock ownership has changed hands to the five funds managed by The Carlyle Group as referenced in the Ferguson Affidavit.

### III.     DISCUSSION OF THE LEGAL ARGUMENTS

**A.     The Law of Corporate Liability ~ Parent Corporations and Piercing the Corporate Veil**

The Plaintiffs cite U.S. v. Bestfoods, 524 U.S. 51, 61 (1998), for the general proposition that parent corporations can be held responsible for the wrongs committed by its agents in the course of its business. However, the Supreme Court's discussion of the general principles of limited corporate liability and piercing the corporate veil do not support the Plaintiffs' claims against The Carlyle Group:

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.
>
> ****
>
> But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.

The Supreme Court further notes that it is hornbook law that control by virtue of stock ownership and parent activities related to supervision of performance and financial and budget decisions of a subsidiary do not create liability:

> Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal.

5

>  \*\*\*\*
>
> "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

Accordingly, under the principles outlined by the Supreme Court, The Carlyle Group's involvement, on the behalf of the Funds, in Board-level decisions regarding strategic budget decisions affecting profit margins does not constitute the type of control that would attribute liability to them for alleged negligence in patient care at a facility owned by a subsidiary five layers removed from the Funds.

The Plaintiffs also cite a number of cases from other jurisdictions which address the question of parent/shareholder liability for negligence in nursing homes. However, none of these court decisions contain either legal theory or factual similarity to support their claims against The Carlyle Group.

In the Estate of Canavan v. National Healthcare Corp., 889 So.2d 825, 826 (Fla.App. 2 Dist. 2004), the Florida court held that the plaintiff could impose liability upon the individual who was the sole owner[6] of the holding company that owned the nursing home and the management company that operated the nursing home. The court held that such liability could be imposed under the concept of piercing the corporate veil based on the facts that the owner had the responsibility of approving the budget for the nursing home and also functioned as the sole member of the "governing body" of the nursing home, pursuant to federal regulation, 42 C.F.R. § 483.75(d) (2002) (the governing body is legally responsible for establishing and implementing

---

[6] Jointly with his wife.

policies regarding the management and operation of the facility and for appointing the administrator who is responsible for the management of the facility). Since the owner was required by federal mandate to create, approve, and implement the facility's policies and procedures and he ignored complaints of inadequate staffing while cutting the operating expenses, the court agreed with the plaintiff in that case that a reasonable jury could have found that the owner's "elevation of profit over patient care" was negligent.

As discussed above, The Carlyle Group is not the owner of the facility. Even if the Plaintiffs' allegation was correct (which it is not), The Carlyle Group would be the owner of the facility's great-great grandparent – five layers up the corporate organizational structure.

The Plaintiffs also refer to another Florida decision in Estate of Despain v. Avante Group, Inc., 900 So.2d 637, 641 (Fla.App. 5 Dist.,2005), however, that case dealt with a corporate employer's vicarious liability for punitive damages which is not pertinent to the issues presented by these motions.

The Plaintiffs' cited case of Montgomery Health Care Facility, Inc. v. Ballard, 565 So.2d 221, 225 (Ala. 1990) deals with vicarious liability of an employer and applies a right of control test under Alabama law. Present with an argument that a parent corporation should be held liable for the torts of its subsidiary nursing home, the Alabama court considered whether the parent was the employer of the tort-feasors or whether as the parent company it retained the right to control the day-to-day operations of the subsidiary's facility. In finding that there was a jury issue, the court cited the facts that the parent was a small family-owned corporation that held 100% of the stock of subsidiary. The president of the parent acted as the administrator of the nursing home for a period of time and then continued to visit the facility monthly several times a month checking patients and watching employees. The president's father, an officer of the parent

7

company, was in the facility almost every day. The administrator of the nursing home reported directly to the president of the parent company and was directly responsible to her. There are no allegations of such control here; rather, the affidavits submitted by this Defendant establish that neither The Carlyle Group nor the Funds have any role in the operations or patient care at the Heartland facility. They are not involved in the day-to-day operations; they do not make policy for patient care; and no one from The Carlyle Group has ever visited the facility.

The flaw in the Plaintiffs' theory of liability is illustrated by one of the cases it cited, <u>Larrimore v. Hospital Corp. of America</u>, 514 So.2d 840, 845 (Ala.,1987). In that case, several hospital patients brought action against a holding company that owned the company that managed the hospitals seeking to impose liability based on vicarious liability/employer theories (HCA, an investor-owned, publicly-traded corporation that owned HMC, a hospital management company). In seeking to impose liability on HCA for alleged negligence at the hospitals, plaintiffs relied upon asserted "important rights of ownership, vested in HCA" which included the right to guarantee management agreements, to institute its own retirement program, to hire and fire employees, to install its own management team, to centralize financial operations-including bookkeeping, contracting, and cash management-and to bill hospitals for the services, expenses, and fringe benefits of the management teams it supplied through HMC. In addition, a HCA corporate officer was a "focal point," a "liaison," and a "conduit" between the corporation that managed the hospitals (HMC) and HCA. Notwithstanding these facts showing a "close-knit" relationship between HCA/parent and HMC/subsidiary, the court held that there was not sufficient evidence that the parent/HCA controlled, or retained the right to control, the day-to-day operations of the HMC-operated hospitals.

In the <u>Larrimore</u> case, a separate claim was made against HCA/parent for a separate

subsidiary that owned/operated one of the hospitals. The facts of that relationship were decidedly different. The parent/HCA installed its own employee as the hospital's administrator; the president, secretary, and assistant secretary of the hospital were officers of HCA; and the other record evidence permitted an inference that the supervisory employees directly responsible for the day-to-day operation of the hospital were officers or employees of parent/HCA. As to that claim, the court held there was a jury issue.

The Plaintiffs do not make any such detailed allegations of specific facts that would establish any level of control over the day-to-day operation of the Heartland facility.[7] Notably, the documents submitted by the Plaintiffs together with the SEC filing and Merger Agreement evidence that The Carlyle Group did not, as did HCA, install its people in the management of Manor Care; rather, the Manor Care executive management stayed in place and continued operating the business. Further, to the extent the Plaintiffs rely on the "acquisition" and generalized allegations of control by virtue of ownership, on this point, the Alabama court made it clear that purchase of 100% of the stock does not legally substitute the parent for the subsidiary as the entity operating the hospital. *Id*. at 845.

By footnote, the Plaintiffs cite <u>Beverly Enterprises – Florida, Inc. v. Spilman</u>, 661 So.2d 867, 873 (Fla. Ct. App. 1995) for the proposition that "the controlling entity cannot evade responsibility under a theory of corporate liability by closing its eyes to the event at the facility".

---

[7] The Plaintiffs criticize this Defendant's *affidavits* as bald assertions of fact. However, the affidavits are definitive declarations of simple facts of ownership; no detail of The Carlyle Group's relationship with its Funds is pertinent; nor is discovery necessary to the issue presented. Ironically, in contrast, the Plaintiffs' allegations are truly bald, as well as too generalized to withstand a motion to dismiss under the pleadings standards articulated by the Supreme Court in *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly.* The Plaintiffs should not be allowed to go a fishing expedition into the relationship between The Carlyle Group and the Funds without any colorable allegations or legal foundation for piercing five layers of corporate structure.

9

[Memorandum in opposition, p. 7 n. 1] In that case, the corporate owner of the facility allegedly attempted to evade punitive damages for the negligence of its employees with an argument that its managing employees knew nothing of the abuse. The court held that the corporate employer could not "escape responsibility by managing its facility with managers who close their eyes, refuse to hear, and dull their sense of smell." The claim against The Carlyle Group is not one of vicarious liability of a corporate owner for the alleged negligence of the facility employees. By the same token, the cited case of Young v. Manor Care Health Services, Inc., 2004 WL 953869 (E.D. Pa. 2004), does not provide any support for the Plaintiffs' argument, to the extent that it only addresses an issue of corporate liability under Pennsylvania law whereby a hospital/healthcare corporation can be held directly liable, apart from vicarious liability for its employees' actions.

     Notably, the Plaintiffs do not cite a single South Carolina decision in support of their theory of liability against The Carlyle Group nor do they address the doctrine of piercing the corporate veil and alter ego liability that is outlined in this Defendant's memorandum in support of its motions. Under South Carolina state law, a parent company cannot be held liable for the actions of its subsidiary unless the plaintiff can prove that the parent controls the business decisions and actions of its subsidiary to become its alter ego. "Control required for liability under an alter ego doctrine amounts to total domination of the subsidiary to the extent the subsidiary manifested no separate corporate interests and functioned solely to achieve the purpose of the dominant corporation." Jones v. Enterprise Leasing Co.-Southeast, 383 S.C. 259, 678 S.E.2d 819, 823 - 824 (Ct. App. 2009). Even if such a level of control or dominance by a parent can be proven, the veil will not be pierced unless the plaintiff can show that the "the retention of separate corporate personalities would promote fraud, wrong or injustice, or would

contravene public policy." *Id*. (citing <u>Mid-South Mgt. Co. Inc. v. Sherwood Dev. Corp.</u>, 374 S.C. 588, 649 S.E.2d 135, 143 (Ct.App.2007)).

There are several factors that the court should consider before a parent corporation can be held liable for the torts of its subsidiaries: stock ownership by parent; common officers and directors; financing of subsidiary by parent; payment of salaries and other expenses of subsidiary by parent; failure of subsidiary to maintain formalities of separate corporate existence; identity of logo; and plaintiff's knowledge of subsidiary's separate corporate existence. Beyond the allegation of ownership, the Plaintiffs have not made any allegation on any of these facts -- there is no evidence of undercapitalization, fraud in the ManorCare corporate operations or structure.

Most significantly, there is no allegation that the Heartland-Charleston subsidiary is not financially viable on its own to meet any potential judgment. The Plaintiffs are well aware, as they were advised through discovery responses (and prior to the filing of responsive pleadings) by the Manor Care Defendants, that the facility maintains insurance to cover any conceivable verdict that a jury could render if Plaintiffs prevail on the merits. In <u>Jones</u>, the Court found that there was no clear evidence of dominance or control and that the subsidiary was "adequately prepared and funded in the event of a verdict against it," and concluded that "no wrong, injustice or contravention of public policy would occur in failing to find [parent] the alter ego of [subsidiary]." *Id*. at 823. The same conclusion is compelled here by the absence of any sufficient allegations that The Carlyle Group exercises the requisite level of dominance or control and by the indisputable fact that the ManorCare defendants are able to respond to any judgment. The bottom line is that there is simply no logical reason  - nor legal basis – for Plaintiffs to be digging into the "deep pockets" of the alleged "great-great grandparent" for any potential judgment they might recover.

11

There is no legal basis for the Plaintiffs' contention that The Carlyle Group can be held liable for any alleged negligence in the care of Ms. Annie Salley based on the fact that it managed the merger or that it works to make ManorCare more profitable.  To the extent that The Carlyle Group is in the business of buying companies and making them more profitable for the investing of funds, the Plaintiffs do not cite any law which would support any theory for vicarious liability based on such investment involvement.  And, to the extent that The Carlyle Group might, through its management of the Funds, have any "in put" in to the strategic financial planning and business development of ManorCare, such indirect, tangential involvement does not equate to the type of conduct or behavior contemplated to impose liability for any alleged negligence in the operation or patient care at any facility.  Ultimately, there is no equitable basis to pierce the five layers of corporate structure to hold The Carlyle Group liable in this case when the Defendants have adequate funding in place to satisfy any potential verdict the Plaintiffs could possibly be awarded.

**B.      Personal Jurisdiction over Parent Corporations**

"When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989).  On a pretrial motion, Plaintiff "need only make a prima facie showing by pleadings and affidavits," or the district court can allow jurisdictional discovery and proceed with an evidentiary hearing to determine the facts and make the findings on minimum contacts.  Brown v. Geha-Werke GmbH, 69 F.Supp.2d 770, 774 (D.S.C. 1999).  In this case, the Plaintiffs pleadings (they have not submitted any affidavits) do not make a prima facie case of personal jurisdiction against The Carlyle Group.

Ultimately, the facts and legal principles to be applied on the issue of personal jurisdiction over The Carlyle Group parallel those involved with the piercing the corporate veil as discussed above. The courts do not reach out to exercise personal jurisdiction over a parent based on activities of a subsidiary unless there is a showing that would meet the piercing test. If, as alleged, The Carlyle Group did own HCR ManorCare, Inc., ownership of that stock along with the normal attendant control as a shareholder does not meet that test. Most assuredly, personal jurisdiction cannot be exercised over an equity firm, such as The Carlyle Group, that manages the Funds that own the shares of a corporation five layers removed from the facility's direct corporate owner.

## CONCLUSION

WHEREFORE, based on the foregoing, Defendant The Carlyle Group respectfully requests that the court grant its motions and dismiss the claims against it.

Respectfully submitted,

HOOD LAW FIRM, LLC
172 Meeting Street / Post Office Box 1508
Charleston, SC  29402
Phone: (843) 577-4435 / Fax: (843) 722-1630
Email: Info@hoodlaw.com


**s/ Elloree A. Ganes**
Robert H. Hood (1939)
Molly H. Craig (6671)
Elloree A. Ganes (9022)
Brian E. Johnson (10098)

Attorneys for the Defendant
The Carlyle Group

**July 16, 2010**
Charleston, South Carolina
J:\docs\20.033\Reply-Pltf MIO-MTD.doc